# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION

No. 7:09-CV-183-F

| | |
|---|---|
| CHRIS W. TAYLOR, for himself and for all others similarly situated, et al., Plaintiffs, | ) ) ) ) |
| v. | ) ORDER |
| LEE W. BETTIS, Jr., Esq., et al., Defendants. | ) ) ) |

This matter is before the court on the Motion to Dismiss [DE-45] filed by Defendants Lee W. Bettis, Jr., Pat Leigh Pittman, Joanne K. Partin, Robert L. Emanuel, Stephen A. Dunn, Raymond E. Dunn, Jr., Emanuel & Dunn, PLLC, and Bettis Dunn & Dunn (collectively, the "E&D Defendants" or "Defendants E&D"); the Motion to Dismiss [DE-52] filed by Defendants W. Andrew Arnold and the Law Offices of W. Andrew Arnold, P.C. (collectively, the "Arnold Defendants"); the Motion to Dismiss filed by Philip M. Manger [DE-91]; the Motion to Appoint Receiver filed by Plaintiffs Brenda Beasley, Dorman Beasley, William G. Harrison, Cathy Horton Hunt, Linda Sheryl Lucas, Sharon Southwood, and Chris W. Taylor (collectively, "Plaintiffs"); the Motion to Certify Class [DE-96] filed by Plaintiffs; the Motion for Judgment on the Pleadings [DE-98] filed by the E&D Defendants; the Motion to Stay the Motion to Appoint Receiver [DE-104] filed by DefendantPhilip M. Manger, and the Motion to Expedite [DE-110] filed by the E&D Defendants. These motions have been pending for some time, and almost all are ripe for ruling.

# I. FACTUAL ALLEGATIONS

One of the Plaintiffs in this potential class action, Sharon Southwood, is also the named Plaintiff in *Southwood v. The Credit Card Solution*, 7:09-CV-81-F ("the *Southwood* action"), also pending before the undersigned. In that action, Southwood alleges, *inter alia*, that Defendant CCDN, LLC, a limited liability company organized under Nevada law, along with other associated entities, ran a debt elimination and credit repair scheme which defrauded her and others. Southwood, and several other Plaintiffs, filed this action several months after the *Southwood* action was removed to this court, alleging claims against many of the same individuals and entities named as defendants in the *Southwood* action. Additional defendants are also named in this action, including several attorneys and law firms which have represented CCDN, LLC, and/or its affiliates, principals, or agents in litigation.

The allegations in the 158-page, 768-paragraph Amended Complaint include the following:

## A. Parties

Defendants CCDN, LLC and other associated entities[1] (collectively, "CCDN") ran a debt elimination and credit repair scheme. Amend. Compl. [DE-23] ¶¶ 1, 60. According to Plaintiffs, CCDN–and the entities and individuals it contracted with to market its "product"–promoted the credit repair scheme and solicited business through several websites and videos posted on the websites and unrelated video-sharing websites. *Id.* ¶¶ 102, 106-09. One of CCDN's top marketers was The Credit Card Solution ("TCCS"), a sole proprietorship of Defendant Robert Mitchell

---

[1] The additional entities include Defendant Legal Debt Cure, LLC, a limited liability company owned by Individual Defendants Robert K. Lock, Colleen Lock, and Philip Manger, *see* Amend. Compl. [DE-23] ¶ 61; Defendant R. K. Lock & Associates, the sole proprietorship of Robert K. Lock, *see id.* ¶ 62.

2

Lindsey, who contracted with R.K. Lock & Associates to sell CCDN's program. *Id.* ¶ 116. In the scheme, as represented by Plaintiffs, CCDN (or the individual marketing CCDN's program) required an advance payment to enroll in their "process." *Id.* ¶ 173. The CCDN marketer then required an enrollee to execute a power of attorney authorizing CCDN to "prepare and sign all documents written with the intent of researching, challenging, negotiating, and otherwise corresponding with creditors, debt buyers, debt collectors, lw[sic] firms, credit reporting bureaus, and government agencies" with respect to specified accounts. *Id.* ¶ 175. Plaintiffs allege that CCDN then sent letters to enrollees' creditors demanding validation of enrollees' accounts, and asking the creditors to execute an affidavit drafted by CCDN that gave certain "assurances" regarding the enrollees' accounts. *Id.* ¶¶ 176-77. Plaintiffs also allege that CCDN informs enrollees they then do not have to repay debts. *Id.* ¶ 187. According to the Plaintiffs, enrollees are then encouraged to "provoke [] and allow creditors and collectors to abuse [enrollees] as much as possible in order to generate enough damages under fair debt collection law to offset the debt." *Id.* ¶ 196.

All of the Plaintiffs allege that they paid specific amounts to marketers of the CCDN program. *Id.* ¶ 227 (Plaintiff Cathy Horton Hunt paid $2,500.00 to Lindsey), ¶ 267 (Plaintiff Linda Sheryl Lucas paid Federal Debt Relief System at least $8,000.00), ¶ 303 (Plaintiff William G. Harrison paid the Aegis Corporation $4,200.00), ¶ 344 (Plaintiff Southwood paid Lindsey $5,600.00), ¶ 387 (Plaintiff Chris W. Taylor paid $4,500.00 to TCCS), ¶ 468 (Plaintiffs Dorman and Brenda Beasley sent a $2,500.00 check to Everett Smith). Plaintiffs allege that some of those marketers who received their payment converted unspecified amounts to the marketer's own use and remitted the remainder, if any, to CCDN. *Id.* ¶ 229 (Defendant Lindsey converted part of Plaintiff Hunt's payment), ¶ 268 (alleging some or all of the money Plaintiff Lucas paid went to the benefit

3

of CCDN), ¶ 303 (alleging that Defendant Aegis converted an unspecified amount to its own use and remitted the remainder to CCDN), ¶ 345 (alleging that Defendant Lindsey "kept part or all of [Plaintiff Southwood's payment] for himself, and transmitted the rest (if any) across state lines to CCDN").

## B. Allegations against E&D Defendants

Plaintiffs Harrison, Hunt, Lucas and Southwood allege that after they became dissatisfied with CCDN, they hired counsel, Christopher Livingston ("Plaintiffs' Counsel" or "Livingston"), "on a contingent basis to try to recover some measure of justice from CCDN" and various other entities and individuals. Am. Compl. ¶ 489 [DE-23]. On September 12, 2008, Livingston "commenced *Hunt v. R.K. Lock & Associates*, 08 CVD 883, *Lucas v. R.K. Lock & Associates*, 08 CVD 884, and *Harrison v. Aegis Corp.*, 08 CVD 885 in Bladen County District Court." *Id.* ¶ 492.

"In or around late November 2008, CCDN Defendants in file numbers 08 CVD 883, 884 and 885 retained E&D Defendants by paying a fee or retainer from the money they criminally derived from Plaintiffs." *Id.* ¶ 512. According to Plaintiffs, "[t]hough E&D 's clients may not have satisfied their bill in full, neither E&D Defendants nor any sensible defense lawyer would remain on such a case for over a year without actually receiving a very substantial amount of money, and if they were not getting paid, E&D Defendants would have long ago resigned from the representation." *Id.* ¶ 512. Plaintiffs assert "Defendants Pittman, Partin, Emmanuel, Steve Dunn and Raymond Dunn, by virtue of their positions as owners and managers of Emmanuel & Dunn, PLLC, and as supervisors of their employee and agent Defendant Bettis, knew that (or their suspicions were aroused by what they learned during the representation, but then they failed to make further inquiry as to whether) their client's sole business and sole source of revenue, proceeds, profit and earnings was and is a

4

combination of wire fraud, mail fraud, bank fraud, obtaining property by false pretenses, and money laundering, and that it as wrong and illegal to accept money so derived." *Id.* ¶ 513. Plaintiffs therefore allege that "E&D Defendants are thereby engaged in a pattern of racketeering activity by laundering of monetary instruments, 18 U.S.C. § 1956(a)(1)(A)(i), (1)(B)(i), (2)(A) and (2)(B)(i), and additional count of the same each time they receive another payment from their clients, and since they conspired to do so, they also violated § 1956(h)." *Id.* ¶ 515.

Plaintiffs go on to allege that "[i]nstead of confining themselves to lawful and ethical defense of a client for alleged past deeds, Raymond Dunn and Mr. Bettis conspired with each other and with Mr. and Mrs. Lock,[2] Mr. Manger, and Tracy Webster[3] to keep CCDN's fraudulent scheme alive, to continue violating the Credit Repair Organization Act, NCUDTPA, RICO and NCRICO, to expand CCDN's business as much as possible, to prevent recovery of Plaintiffs' property from CCDN or anyone else, and to pay E&D Defendants with property criminally defrauded from Plaintiffs." *Id.* ¶ 519.

Plaintiffs assert that the E&D Defendants "declared war" on Plaintiffs and Livingston. Plaintiffs allege that Livingston

> lodged a report on the evening of 04 December 2008 with the Bladen County Sheriff's Office to the effect that while Counsel was driving through northern Bladen County, Mr. Bettis had telephoned him and communicated threats to him that reasonably could be interpreted (especially given Mr. Bettis's claim to be an expert in representing racketeers) as credible threats of bodily harm if Counsel did not

---

[2] Defendant Robert K. Lock is alleged to be an owner and manager of CCDN, LLC, Robert K. Lock & Associates, and Legal Debt Cure, and is the alleged founder, along with the Defendant Philip Manger of the CCDN program. Amend. Compl. [DE-23] ¶¶ 66, 464. His wife, Defendant Colleen Tomasino Lock, is an alleged owner of Legal Debt Cure and CCDN, LLC. *Id.* ¶ 67.

[3] Defendant Tracy Webster is alleged to have been an employee or agent of Robert K. Lock Associates and/or CCDN, LLC and to have done work as a paralegal. ¶ 70.

5

dismiss with prejudice (without his client's permission) all complaints against Mr. Betttis's clients, to wit, twice shouted at Counsel: "We're coming after you!" referring to Mr. Bettis's clients, who are ruthless and very wealthy, and will stop at nothing to get away with their extremely profitable crimes and frauds.

*Id.* ¶ 528.

Plaintiffs further allege that "on the afternoon of 05 December [2008], Counsel was in the Bladen County Courthouse clerk's office when Mr. Bettis telephoned yet again and revealed, for the first time, that CCDN, LLC was organized in Nevada, and falsely claimed that since CCDN, LLC had not been sued, that a necessary defendant was missing and all the cases would have to be dismissed, and CCDN would collect Rule 11 fees." *Id.* ¶ 530. Following this phone conversation, "[a]t the hearing on 08 December 2008 before the Hon. Napoleon B. Barefoot, Jr., Mr. Bettis served motions to dismiss Ms. Hunt's and Ms. Lucas's cases, frivolously arguing, in writing, lack of personal jurisdiction (without specifically contradicting any of the facts constituting minimum contacts) and that default should be set aside on grounds that (1) CCDN and its personnel themselves determined that they are liable for nothing and that probably no actual lawsuit had even been commenced, and (2) [Plaintiffs'] Counsel is a bad lawyer and need not be taken seriously, and therefore they did not answer." *Id.* ¶ 533.

Plaintiffs allege that Mr. Bettis, *inter alia*, fraudulently misrepresented to the Bladen County District Court that CCDN, LLC, was a necessary defendant, and that North Carolina had no personal jurisdiction over any defendant. According to Plaintiffs, "District Court, Judge Barefoot presiding, [was] thus misled and unfairly prejudiced against Plaintiffs and Counsel by Defendant's fraud on the court, [and] dismissed all three cases." *Id.* ¶ 616.

While those three cases were pending, Plaintiff Sharon Southwood "commenced *Southwood v. The Credit Card Solution*, 09 CVS 19 in Bladen County Superior Court, by means of a verified

6

complaint seeking relief for a nationwide class against TCCS, CCDN, Mr. and Mrs. Lock, Mr. Manger, Mr. Lindsey, and CCDN, LLC." *Id.* ¶ 544. "Mr. Lindsey immediately retained Mr. Bettis to represent him and TCCS." *Id.* ¶ 547. Plaintiffs allege that "Mr. Lindsey or CCDN or both paid E&D Defendants a retainer out of criminally derived property that they defrauded from Plaintiffs." *Id.* ¶ 548. Plaintiffs allege that Mr. Bettis, on behalf of his clients, moved for the disqualification of Plaintiffs' Counsel in the *Southwood* case, on the basis that Plaintiffs' Counsel was a necessary witness to the case. Plaintiffs contend that Mr. Bettis made misrepresentations in court. According to Plaintiffs, "[b]ecause Defendants unfairly prejudiced him against [Plaintiffs'] Counsel, Bladen County Senior Resident Superior Court Judge Douglas Sasser–without evidentiary support other than Mr. Bettis' misrepresentations–ruled orally on 30 April 2009 that [Plaintiffs'] counsel must be disqualified for being a necessary witness and a possible defendant." *Id.* ¶ 628. On or about May 19, 2011, the state trial court signed an order "purporting to disqualify [Plaintiffs' Counsel] for being a necessary witness," but Plaintiffs allege the order is null and void "because on 15 May 2009 Mr. Bettis and Steve Dunn had already deprived Superior Court of subject matter jurisdiction over 09 CVS 19 by filing with Superior Court a Notice of Removal to" this court. *Id.* ¶¶ 631-32. "At no later than this time, Steve Dunn began accepting money that he knew was criminally derived property, and actively helping his clients keep Plaintiffs' property away from them, by among other things composing a frivolous motion to dismiss Ms. Southwood's case primarily for the purpose of delay, with the goal of keeping his clients in business and indefinitely continuing to defraud victims and launder money." *Id.* ¶ 633.

## C. Allegations against the Arnold Defendants

Defendant W. Andrew Arnold ("Andy Arnold") is admitted to practice law in South

7

Carolina, and is the sole owner and manager of Defendant The Law Offices of W. Andrew Arnold, P.C., a South Carolina corporation ("WAA"). *Id.* ¶ 53. Plaintiffs allege that Mr. Arnold began representing CCDN and/or Robert K. Lock and Associates in October 2008 in the case *Capital One Bank USA, N.A. v. Carefree Debt, Inc.*, SCD 0:08-cv-2274-JFA ("the South Carolina litigation"), in which the plaintiff, Capital One, seeks damages for CCDN's trademark infringement and tortious interference with contracts. *Id.* ¶ 55. Allegedly, CCDN has sent many letters bearing Capital One's trademarked logo without authorization, and has told at least 37 Capital One cardholders to stop repaying their debts. *Id.* According to Plaintiffs, Mr. Arnold conspired with his clients in the South Carolina litigation

> to conduct sham litigation without any reasonable expectation of a favorable ruling ..., including but not limited to advancing frivolous arguments to dismiss for failure to state a claim and lack of jurisdiction and pleading a frivolous Rule 11 affirmative defense, with the intent and effect of perpetuating CCDN's 18 U.S.C. §§ 1341, 1343, and 1344 activities, and by receiving, on two or more occasions since October 2008, money from his clients that he knew to be the proceeds of some form of unlawful activity, and knew that his clients obtained said property from Plaintiffs by means of the specified unlawful activities of mail, wire, and bank fraud, with the intent and effect of promoting the carrying on of said specified unlawful activity . . . .

*Id.* ¶ 58.

## D. Allegations against Philip Manger

Plaintiffs allege that Defendant Philip M. Manger is admitted to practice law in the state of New York, and is an owner of CCDN, LLC, and a manager of CCDN, R.K. Lock & Associates, and Credit Card Collections Defense Network. *Id.* ¶ 68. Defendant Manger is advertised as a founder of CCDN, and an attorney with specialized knowledge of credit reporting law. He allegedly encouraged some Plaintiffs to enroll in the CCDN program, and corresponded with various Plaintiffs about the terms of their contracts with CCDN. *Id.* ¶¶ 222, 355, 440.

8

## II. E&D DEFENDANTS' MOTION TO DISMISS

The E&D Defendants move, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, to dismiss this action or ask the court to abstain from adjudicating it, under two different principles.[4] The court will address each, below.

### A. *Colorado River* Abstention

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colorado River Waster Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *Great American Ins. Co. v. Gross*, 468 F.3d 199, 206 (4th Cir. 2006). In general, "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *McClellan v. Carland*, 217 U.S. 268, 282 (1910). The Supreme Court, however, has indicated that "federal courts may decline to exercise their jurisdiction, in otherwise 'exceptional circumstances,' where denying a federal forum would clearly serve an important countervailing interest." *Great American Ins.* , 468 F.3d at 206 (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (quoting *Colorado River*, 424 U.S. at 813)).

Absention under *Colorado River* is only appropriate if the court first determines that the federal and state suits are parallel. Simultaneous federal state and state suits are deemed parallel if "substantially the same parties litigate substantially the same issues." *New Beckley Mining Corp. v. Int'l Union, UMWA*, 946 F.2d 1072, 1073 (4th Cir. 1991). The Fourth Circuit has reviewed the similarities between concurrent federal and state suits in three key respects: (1) the parties; (2) the legal issues; and (3) the remedy sought. *See, e.g., Great American Ins.*, 468 F.3d at 207-08

---

[4] The E&D Defendants originally also moved to dismiss this action for improper service pursuant to Rules 12(b)(2), (4) and (5). These defendants have since filed a waiver of service [DE-69], so the court will not address those arguments.

9

(reviewing all three in determining that the district court erred in dismissing the court on *Colorado River* abstention grounds). If the court determines that the actions are parallel, the court must then balance six factors as set forth by the Fourth Circuit to determine whether an "exceptional circumstance" exists. *Chase Brexton Health Servs, Inc. v. Maryland*, 411 F.3d 457, 463 (4th Cir. 2005). The factors are:

(1) whether the subject matter of the litigation involves property where the first court may assume in rem jurisdiction to the exclusion of others; (2) whether the federal forum is an inconvenient one; (3) the desirability of avoiding piecemeal litigation; (4) the relevant order in which the courts obtained jurisdiction and the progress achieved in each action; (5) whether state law or federal law provides the rule of decision on the merits; and (6) the adequacy of the state proceeding to protect the parties' rights.

*Id.* at 463-64.

In order to find that state and federal actions are parallel, the Fourth Circuit "requir[es] that the parties involved be almost identical." *Great American Ins. Co.,* 468 F.3d at 208. Here, even assuming that the various attorneys named as defendants in this action, who are not defendants in the three state-court actions or the *Southwood* action in this court, do not preclude a finding of parallel actions, the court still must conclude that *Colorado* abstention is inappropriate. The E&D Defendants have filed a copy of the North Carolina Court of Appeals' opinion in *Cullen v. Emmanuel & Dunn, PLLC*, 731 S.E.2d 274, 2012 WL 3573696, at \*10 (N.C. Ct. App. August 21, 2012) which in turn recounts the North Carolina Court of Appeals' decision in *Lucas v. R.K. Lock & Assocs.*, 209 N.C. App. 753, 710 S.E.2d 707, 2011 WL 721289 (N.C. Ct. App. March 1, 2011), *disc. review denied*, 365 N.C. 347, 719 S.E.2d (2011). As the record makes clear, the state court litigation underlying the claims asserted in the instant suit has reached its conclusion. *See Lucas*,

10

2011 WL 721289. As such, there is no other action in favor of which this court may decline to exercise its jurisdiction.

## B. *Younger* abstention

As the parties recognize, under the abstention doctrine announced in *Younger v. Harris*, 401 U.S. 37 (1971) and its progeny, a federal court must abstain from interfering in state proceedings, even if jurisdiction exists, if the following three factors are present: "(1) there is an ongoing state judicial proceeding brought prior to substantial progress in the federal proceeding; that (2) implicates important, substantial, or vital state interests; and (3) provides adequate opportunities to raise constitutional challenges." *Nivens v. Gilchrist*, 444 F.3d 237, 241 (4th Cir. 2006); *see also Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432-34 (1982). Thus, courts have routinely abstained from actions brought by attorneys seeking to enjoin or challenge ongoing state attorney disciplinary proceedings. *See, e.g., Middlesex*, 457 U.S. 434; *Gilbert v. North Carolina State Bar*, 660 F.Supp. 2d 636, 648 (E.D.N.C.. 2009). In so ruling, courts have recognized that states have "important and substantial interest in prosecuting state attorney disciplinary actions." *Gilbert*, 660 F.Supp.2d at 644.

Here, the E&D Defendants posit that the majority of the claims lodged against them in this action center on what Plaintiffs allege was their professional misconduct in the various state court actions, and that Plaintiffs' claims in this action constitute either an attempt to relitigate the issues raised in the state court actions or seek reprisal for the E&D Defendants' alleged professional misconduct. The E&D Defendants contend that Plaintiffs' Counsel could have addressed these issues during the course of this litigation, either in state court or with the North Carolina State Bar, but has chosen not to do so. The E&D Defendants concede that in this posture, the instant case is

11

"atypical of *Younger* and its progeny, [but] consideration of the factors set forth in *Younger* favors exercising abstention in this case." Reply [DE-70] p. 5.

This court has not located another decision in which a court applied *Younger* to abstain from hearing civil claims brought by plaintiffs against a defendant attorney which also could be–but presently is not–the subject of a state attorney disciplinary hearing against the defendant attorney. To be sure, the Fourth Circuit has made clear that "a defendant to a coercive administrative proceeding must exhaust his state administrative and judicial remedies and may not bypass them in favor of a federal court proceeding in which he seeks effectively 'to annul the results' of a state administrative body.'" *Moore v. City of Asheville*, 396 F.3d 385, 388 (4th Cir. 2005) (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 608 (1975)). Here, however, there are no results of a state administrative body to annul or challenge. There is no indication that any of the E&D Defendants are presently, or have been in the past, subject to a disciplinary proceeding by the North Carolina State Bar for the alleged actions underlying this lawsuit. Without compelling precedent showing why extending *Younger* abstention to the procedural facts underlying this case is appropriate, the court declines to do so. The E&D Defendants' Motion to Dismiss [DE-45] is therefore DENIED.

## III. E&D' DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

The E&D Defendants also move, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings, arguing that the pleadings demonstrate that Plaintiffs have failed to state a claim for which relief can be granted.

### A. Standard of Review

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).

12

"[T]he defense of failure to state a claim upon which relief can be granted as set forth in Rule 12(b)(6) may be raised by motion for judgment on the pleadings." *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 405 (4th Cir. 2002). *See also* Fed. R. Civ. P. 12(h)(2). When faced with a motion for judgment on the pleadings, courts apply the "same standard for Rule 12(c) motions as for motions made pursuant to Rule 12(b)(6). *Elkins Radio*, 278 F.3d at 405-06.

That is, a court must determine the legal sufficiency of the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In so doing, the court assumes the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, the " '[f]actual allegations must be enough to raise a right to relief above the speculative level' and have 'enough facts to state a claim to relief that is plausible on its face.' " *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (citing *Twombly*, 550 U.S. at 555). Moreover, although the court draws all reasonable factual inferences in a plaintiff's favor, the court is not obligated to accept a complaint's legal conclusions drawn from the facts. *Iqbal*, 129 S.Ct. at 1949-50. Nor must the court accept as true "unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 301-02 (4th Cir. 2008)(quotations omitted).[5]

## B. RICO Claims

---

[5] Plaintiffs suggest that something may be untoward about the E&D Defendants moving for judgment on the pleadings after previously filing a motion to dismiss. The court does not agree. *See, e.g., Alexander v. City of Greensboro*, 801 F.Supp.2d 429. 434 (M.D.N.C. 2011) (observing that Rule 12(g) must be read in conjunction with Rule 12(h)(2), and concluding that a party may file a Rule 12(c) motion for failure to state a claim even after filing a Rule 12(b)(6) motion).

13

Plaintiffs allege the "Individual Defendants"–which include many of the E&D Defendants–violated 18 U.S.C. §§ 1962(c) and 1962 (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The E&D Defendants argue that Plaintiffs' allegations in support of these claims are, at least with regard to the E&D Defendants, wholly conclusory and flow "from the speculative premise that by defending clients in civil actions for alleged RICO violations, Defendants E&D must have participated in their alleged racketeering activity." E&D Mot. for J. on the Pleadings [DE-100] p. 9. The court agrees with the E&D Defendants that the allegations are conclusory and fail to state a claim under RICO.

### 1. Section 1962(c) Claim

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Accordingly, to state a claim under § 1962(c), a plaintiff must allege facts sufficient to show that the defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Whitney, Bradley & Brown, Inc. v. Kammermann*, No. 10-1880, 2011 WL 2489416, at *1 (4th Cir. June 23, 2011). A plaintiff also must allege that he was injured in his business or property as a result of such conduct. *Palmetto State Med. Ctr. v. Operation Lifeline*, 117 F.3d 142, 148 (4th Cir. 1997); *see also Sedima,* 473 U.S. at 496. Plaintiffs appear to argue that the E&D Defendants conducted or participated in two separate enterprises. Namely, Plaintiffs allege that the E&D Defendants participated in or conducted the CCDN

14

enterprise, and that law firm through which the E&D Defendants practiced or have practiced, Emmanuel & Dunn, constitutes a separate enterprise.

### a. "Conduct or participate" in the alleged CCDN enterprise

With regard to the CCDN enterprise, the issue raised by E&D's motion for judgment on the pleadings concerns the first element of a § 1962(c) claim: the conduct or participation element.

In *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993), the Supreme Court held that "'to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." In so doing, the Supreme Court explained:

An enterprise is "operated" not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. An enterprise also might be "operated" or "managed" by others "associated with the enterprise who exert control over it as, for example, by bribery.

. . .

[Section] 1962(c) cannot be interpreted to reach complete "outsiders" because liability depends on showing that the defendants conducted or participated in the conduct of the *"enterprises's* affairs" not just their *own* affairs. Of course, "outsiders" may be liable under § 1962(c) if they are "associated with" an enterprise and participate in the conduct of *its* affairs–that is, participate in the operation or management of the enterprise itself . . . ."

*Id.* at 184-85(emphasis in original, footnote omitted). Accordingly, in *Reves*, the Supreme Court affirmed the granting of summary judgment on a § 1962(c) claim against an outside accounting firm, even though the evidence suggested that the accounting firm had created the very financial statements it was hired to audit for its client and took on the responsibility of deciding how to value its client's most valuable asset. *Id.* at 186. *See also id.* at 189-90 (Souter, J., dissenting).

Since the *Reves* decision, most courts have held that an outside professional, such as an attorney, "does not conduct an enterprises's affairs through run-of-the-mill provision of professional

15

services." *Handeen v. Lemaire*, 112 F.3d 1339, 1348 (8th Cir. 1997) (collecting cases); *see also Thomas v. Ross & Hardies*, 9 F. Supp. 2d 547, 554 (D.Md. 1998) ("Since *Reves*, a number of Courts have dismissed complaints and granted summary judgment in favor of professionals, such as lawyers and accountants, whose professional services were essential to an enterprise yet did not participate in the direction, operation, or management of the enterprise."). These same courts have recognized, however, that *Reves* did not establish blanket immunity from RICO liability on outside professionals. *See, e.g., Handeen*, 112 F.3d at 1349 ("Neither *Reves* nor RICO itself exempts professionals, as a class, from the law's proscriptions . . . ."). Rather, these courts have recognized that an outside professional, such as attorney, may be liable under § 1962(c) if he renders professional services that "strike at the very core of the enterprise." *Thomas*, 9 F. Supp. 2d at 554. *See also Handeen*, 112 F.3d at 1349 ("Behavior prohibited by § 1962(c) will violate RICO regardless of the person to whom it may be attributed, and we will not shrink from finding an attorney liable when he crosses the line from traditional rendition of legal services and active participation in directing the enterprise."); *State Farm Mut. Automobile Ins. Co. v. Abrams*, No. 96 C 6365, 2000 WL 574466, at *11 (N.D. Ill. May 11, 2000) ("[If a doctor or lawyer provides services that go to the heart of the allegedly fraudulent scheme, the professional may be liable for providing some direction in the affairs of the enterprise.").

For example, in *Handeen*, the Eighth Circuit Court of Appeals reversed the district court's granting of summary judgment to a defendant law firm and its principals on the plaintiff's RICO claims because the allegations, if proven, would allow the finding that the attorneys and law firm participated in the core activities that constituted the affairs of the enterprise. 112 F.3d at 1350. Specifically, the plaintiff in *Handeen* was a creditor in a Chapter 13 bankruptcy proceeding who alleged that the debtor-in-bankruptcy sought to use the bankruptcy system to fraudulently obtain a

16

discharge of the creditor's judgment. The plaintiff alleged the law firm hired by the debtor instructed the debtor to overstate his debts (and execute a false promissory note) and devised a scheme to conceal the debtor's increased income. The Eighth Circuit concluded that the allegations were sufficient to show that the law firm took the lead in making important decisions concerning the operation of the "enterprise"–which in *Handeen* was the Chapter 13 bankruptcy estate. Similarly, courts have held that attorneys can be held liable under RICO where the attorneys acted as a direct participant in the alleged scheme to file false claims or lawsuits. *See, e.g., Abrams*, 2000 WL 674466 at \*11 (denying attorney defendants' motion for summary judgment where alleged purpose of the enterprise was to manufacture and pursue fraudulent insurance claims and the evidence suggested the attorneys knowing pursued false claims); *Shuttlesworth v. Housing Opportunities Made Equal*, 873 F. Supp. 1069, 1075 (S.D. Ohio 1994) (denying attorney defendants' motions to dismiss where attorneys allegedly actively solicited false sexual harassment complaints against plaintiff landlord in an effort to deprive him of his rental properties).

Here, the majority of the E&D Defendants' activities, as alleged by Plaintiffs, concern defending other RICO actions instituted by Plaintiff. Whatever Plaintiffs' objections may be to how the E&D Defendants rendered legal services in the defense of those RICO actions, it cannot be said that the actions of the E&D Defendants went to the heart of CCDN's alleged debt elimination and credit restoration scheme. Rather, defending other RICO actions, without other involvement in the alleged debt elimination and credit restoration scheme, quintessentially is the "traditional rendition of legal services." *Handeen*, 112 F.3d at 1349. Under Plaintiffs' logic, any attorney daring to serve as defense counsel to a defendant named in a RICO action automatically could be named as a RICO defendant himself. This, of course, is untenable. Concomitantly, under these facts, accepting money

17

in exchange for providing these traditional legal services[6] fails to go to the heart of CCDN's alleged debt elimination and credit restoration scheme.

Accordingly, to the extent that Plaintiffs attempt to allege a § 1962(c) claim against the E&D Defendants for providing legal services, in the form of defending RICO actions instituted by Plaintiffs, and accepting payment for those services, the claim is DISMISSED.

### b. The Emmanuel & Dunn Enterprise

Plaintiffs also allege that the law firm of Emmanuel & Dunn itself constitutes a separate RICO enterprise, and that the E&D Defendants, by virtue of accepting payments from their CCDN clients for legal representation, have engaged in a pattern of racketeering activity, namely money laundering in violation of 18 U.S.C. §§ 1956 and 1957. Any claim under § 1962(c) with regard to the alleged Emmanuel & Dunn enterprise, however, must be dismissed for failure to sufficiently allege injury.

As this court already has observed, in order to make out a claim for violation of § 1962, a plaintiff must allege that each RICO defendant conducted an enterprise through a pattern of racketeering and that the plaintiff was injured in his business or property as a result of such conduct. *Sedima*, 473 U.S. at 496; *see also* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . ."). Section 1964(c) "requires the plaintiff to make two closely related showings: (1) that he has suffered injury to his business or property; and (2) that this injury was

---

[6] The court recognizes that Plaintiffs allege their counsel lodged a report with the Bladen County Sheriff's Office that Defendant Bettis verbally threatened him on December 4, 2008. Amend. Compl. [DE-23] ¶ 528. This lone act by Defendant Bettis, however, does not change the character of the legal services rendered by the E&D Defendants. Moreover, considered separately, this sole act cannot constitute a pattern of racketeering activity.

18

caused by the predicate acts of racketeering activity that make up the violation of § 1962." *Brandenburg v. Seidel*, 859 F.2d 1179, 1187 (4th Cir. 1988), overruled on other grounds by *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996). "The Supreme Court has explained these injury and causation requirements as aspects of standing, rather than elements of the civil RICO plaintiff's prima facie case." *Id.* Accordingly, "it is clear that a civil RICO complaint is vulnerable to a motion to dismiss if it fails to allege either an adequate injury to business or property, or an adequate causal nexus between that injury and the predicate acts of racketeering alleged." *Id.*

Accordingly, in this case, assuming *arguendo* that Plaintiffs have sufficiently alleged that each of the E&D Defendants all engaged in a pattern of racketeering activity, in violation of § 1962(c), Plaintiffs still must allege they were injured in their property or business. *See* 18 U.S.C. § 1964(c). With regard to the injury requirement, "[i]njury to mere expectancy interests or to an 'intangible property interest' is not sufficient to confer RICO standing." *Regions Bank v. J.R. Oil Co., LLC*, 387 F.3d 721, 730 (8th Cir. 2004)(quoting *Price v. Pinnacle Brands*, 138 F.3d 602, 607 (5th Cir. 1998)); *see also Strates Shows, Inc. v. Amusements of America, Inc.*, 379 F. Supp. 2d 817, 825 (E.D.N.C. 2005). Although the Amended Complaint is voluminous, there are very few allegations—other than summary, conclusory allegations—regarding how the alleged acts of money laundering by the E&D Defendants resulted in injury to Plaintiffs. The court's own review of the Amended Complaint reveals just one possible allegation: that Defendant Bettis's conduct (presumably including the acceptance of legal fees for services from CCDN) has "result[ed] in great harm to Plaintiffs by delaying and reducing their rightful relief." Amend. Compl. [DE-23] ¶ 607. In other words, Plaintiffs allege that the E&D Defendants' actions have delayed or hindered the realization of their expected or anticipated recovery of damages, in other actions brought by various

19

plaintiffs, for wrongs allegedly perpetrated by the CCDN Defendants. This possibility of a judgment in Plaintiffs' favor, and the possibility of a right to recover therefrom, is not a cognizable injury under RICO. It is, rather, a "mere expectancy." *Regions Bank*, 387 F.3d at 730; *Price*, 138 F.3d 607. With no allegation of an injury to property or business cognizable under RICO, Plaintiffs' lack standing to pursue this claim against the E&D Defendants with regard to their acts in the alleged Emmanuel & Dunn enterprise. *Cf. Cullen v. Emmanuel & Dunn, PLLC*, 731 S.E.2d 274, 2012 WL 3573696, at *10 (N.C. Ct. App. August 21, 2012) (determining, after reviewing federal cases examining the federal RICO statute, that "[t]he potential for plaintiffs to have recovered some indeterminate portion of their losses is not the concrete loss to business or property necessary for a NC RICO cause of action"). Plaintiffs' claim alleging § 1962(c) violation against the E&D Defendants is therefore DISMISSED.

### 3. § 1962(d) claim

Under § 1962(d), it is unlawful to conspire to violate any provision of § 1962(a), (b), or (c) of RICO. To plead a violation of § 1962(d), a plaintiff must allege that "each defendant agreed that another coconspirator would commit two or more acts of racketeering." *United States v. Pryba*, 900 F.2d 748, 760 (4th Cir. 1990). As discussed above, Plaintiffs appear to allege the existence of two separate RICO enterprises: the CCDN enterprise, and the law firm of Emmanuel & Dunn. Regardless of the alleged enterprise, Plaintiffs' allegations are insufficient to establish a § 1962(d) conspiracy claim against any E&D Defendant.

With regard to both alleged enterprises, Plaintiffs have presented only the following conclusory allegation:

Instead of confining themselves to lawful and ethical defense of a client for alleged past deeds, Raymond Dunn and Mr. Bettis conspired with each other and

20

with Mr. and Mrs. Lock, Mr. Manger, and Tracy Webster to keep CCDN's fraudulent scheme alive, to continue violating the Credit Repair Organization Act, NCUDTPA, RICO, and NCRICO, to expand CCDN's business as much as possible, to prevent recovery of Plaintiffs' property from CCDN or anyone else, and to pay E&D Defendants with property criminally defrauded from Plaintiffs.

Amend. Compl. [DE-23] ¶ 519. The court agrees with the E&D Defendants that this does not satisfy *Twombly*'s requirement for a plaintiff to plead enough factual matter "to raise a reasonable expectation that discovery reveal evidence of illegal agreement." 550 U.S. at 556. Indeed, Plaintiffs' RICO conspiracy claims against the E&D Defendants appears to rest on the factually unsupported premise that by agreeing to defend clients in civil actions for alleged RICO violations, the E&D Defendants therefore necessarily entered into an agreement to keep "CCDN's fraudulent scheme alive." There are no other factual allegations suggesting that any of the E&D Defendants entered into an illegal agreement. *Cf. Walters v. McMahen*, 795 F. Supp. 2d 350, 355-56 (D. Md. 2011) (indicating that to adequately plead a § 1962(d) conspiracy, a plaintiff "must 'describe in detail the conspiracy, including the identity of the co-conspirators, the object of the conspiracy, and the date and substance of the conspiratorial agreement' ") (quoting *Cruz v. Cinram Int'l, Inc.*, 574 F. Supp. 2d 1227, 1236 (N.D. Ala. 2008)). Without such factual allegations, Plaintiffs fail to state a plausible § 1962(d) claim against the E&D Defendants.

## C. NC RICO

Plaintiffs also allege that the E&D Defendants violated the North Carolina Racketeer Influence and Corruption Organizations Act, N.C. Gen. Stat. §§ 75D-1, *et seq.* ("NC RICO"). The NC RICO statute forbids any person from "engag[ing] in a pattern of racketeering activity," conducting or participating in an enterprise through a pattern of racketeering activity, or conspiring to do the same. N.C. Gen. Stat. § 75D-4(a). Like its federal counterpart, the NC RICO statute

21

provides a private right of action for "[a]ny innocent person who is injured or damaged in his business or property by reason of any violation of G.S. 75D-4 involving a pattern of racketeering activity . . . ." N.C. Gen. Stat. § 75D-8(c).

After Plaintiffs initiated this action, one of them (William G. Harrison, Sr.) along with another individual, filed suit in state court against Defendants Emmanuel & Dunn, PLLC, Lee W. Bettis, Jr., Robert L. Emmanuel, Raymond E. Dunn, and Stephen A. Dunn (collectively, "state court defendants"), asserting claims for negligent supervision, tortious interference with prospective economic advantage, statutory attorney fraud, and a claim under NC RICO. The claims were based on largely the same factual allegations as those asserted in the instant action. *Compare* Amend. Compl. [DE-23] *with* State Court Complaint [DE-110-2 through 110-4] (*Cullen v. Emanuel & Dunn, PLLC*, No. 11 CVS 20). A North Carolina Superior Court granted the state-court defendants' motion for judgment on the pleadings. On appeal, the North Carolina Court of Appeals affirmed. *See Cullen v. Emanuel & Dunn, PLLC*, 2012 WL 3573696 at *5-11. With regard to the NC RICO claims against the state-court defendants, the North Carolina Court of Appeals ruled that the state-court plaintiffs failed to sufficiently allege a pattern of racketeering and an injury cognizable under NC RICO. *Id.* at *9-11. The North Carolina Supreme Court denied the state-court plaintiffs' petition for discretionary review on January 24, 2013. *Id.*, 736 S.E.2d 494 (N.C. 2013).

Accordingly, Plaintiffs' NC RICO claim against Defendants Emmanuel & Dunn, PLLC, Lee W. Bettis, Jr., Robert L. Emmanuel, Raymond E. Dunn, and Stephen A. Dunn appears to be barred by the doctrine of *res judicata.* "Under the doctrine of res judicata, 'a final judgment on the merits bars further claims by parties or their privies based on the same cause of action.' " *Andrews v. Daw*,

201 F.3d 521, 524 (4th Cir. 2000)(quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)).

Consequently, a later claim is precluded under the doctrine of res judicata when:

> 1) the prior judgment was final and on the merits, and rendered by a court of competent jurisdiction in accordance with the requirements of due process; 2) the parties are identical, or in privity, in the two actions; and 3) the claim in the second matter is based upon the same cause of action involved in the earlier proceeding.

*In re Varat Enter., Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996). Under these principles, the Plaintiffs' NC RICO claim against Defendants Emmanuel & Dunn, PLLC, Lee W. Bettis, Jr., Robert L. Emmanuel, Raymond E. Dunn, and Stephen A. Dunn must be DISMISSED.

Moreover, to the extent that *res judicata* does not bar Plaintiffs' claim against the aforementioned defendants, and to the extent that Plaintiffs assert a NC RICO claim against the remaining E& D Defendants,[7] the claim must nevertheless be dismissed for the same reasons stated in connection with the federal RICO statute. *See Kaplan v. Prolife Action League of Greensboro*, 123 N.C. App. 720, 727-29, 475 S.E.2d 247, 252-54 (1996) ("[I]t is apparent the General Assembly did not intend to provide NC RICO with broader remedial stroke than its federal counterpart."); *see also Cullen*, 2012 WL 3573696 at *9 (noting that the General Assembly expressly stated in N.C. Gen. Stat. § 75D-2(b) that "[i]t is not the intent of the General Assembly to in any way interfere with the attorney-client relationship").[8]

---

[7] Pat Leigh Pittman, Joanne K. Partin, and Bettis, Dunn & Dunn.

[8] The court looks to the rulings of the North Carolina Court of Appeals to predict how the North Carolina Supreme Court would rule on the issue. *See Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002) (explaining that where a state supreme court has spoken neither directly or indirectly on a particular issue, an state's intermediate appellate court's decisions provide the next-best indicator of what a state's law is).

23

## D. Credit Repair Organization Act

Plaintiffs also allege a claim against the E&D Defendants for violations of the Credit Repair Organization Act ("CROA"), 15 U.S.C. § 1692 *et seq.* Congress enacted the CROA in 1996 with two stated purposes: "(1) to ensure that prospective buyers of the services of the credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b). To that end, the CROA "requires organizations that fall within its ambit to make certain disclosures prior to doing business with members of the public and prohibits them and persons connected with them from engaging in deceptive practices injurious to the public." *Zimmerman v. Puccio*, 613 F.3d 60, 70 (1st Cir. 2010) (citing 15 U.S.C. §§ 1679b-1679e).

Although some courts have taken an expansive view that proscriptions in § 1679b(a)[9] apply to "any person," *see, e.g., Bigalke v. Credittrust Corp.*, 162 F. Supp. 2d 996, 999 (N.D. Ill. 2001), this court previously has determined that the prohibited practices in § 1679b(a) apply "only to 'persons' acting in the context of credit repair organizations and services." *Bentley v. Alan Vester Auto Grp., Inc.*, No. 5:07-CV-434-F, 2009 WL 3125539, at *2 (E.D.N.C. Sept. 29, 2009) (expressly incorporating the opinion of Chief Judge Robert L. Hinkle in *Lopez v. ML #3, LLC*, 607 F. Supp. 2d 1310, 1311-14 (M.D. Fla. 2009)). Under the CROA, a "credit repair organization" is

> any person who uses any instrumentality of interstate commerce or the mails to sell, provide or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of–

---

[9] The proscription in § 1679b(b), by its express terms, only applies to "credit repair organizations."

24

(i) improving any consumer's credit record, credit history, or credit rating; or

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i) . . .

§ 1679a(3). Although the Fourth Circuit has not addressed the definition of "credit repair organization," the plain language of the statute requires the following to be established in order to find that a defendant is a credit repair organization: the defendant "(1) used any instrumentality of interstate commerce, or the mails to (2) sell, provide, or perform (or represent that [it] could do so) (3) in return for valuable consideration (4) services or advice about services (5) for the express or implied purpose of improving a consumer's credit record, credit history, or credit rating." *Hillis v. Equifax Consumer Servs., Inc.*, 237 F.R.D. 491, 511 (N.D. Ga. 2006).

As the E&D Defendants correctly note, Plaintiffs fail to include any allegations in the Amended Complaint which could establish that *any* of the E&D Defendants could qualify as a credit repair organization under the statute. Plaintiffs seemingly concede this point, but argue that the E&D Defendants are "liable by conspiracy." Pl.'s Mem. in Opp. to Mot. for J. [DE-107] p. 12. Assuming *arguendo* that a plaintiff may hold a defendant liable under the CROA under a theory of conspiracy, Plaintiffs have utterly failed to plead any factual allegations which could indicate that *any* E&D Defendant entered into a conspiracy to violate the CROA. As is the case with Plaintiffs' RICO conspiracy claim, simply stating certain E&D Defendants "conspired . . . to continue violating the [CROA]" is insufficient. Accordingly, Plaintiffs' CROA claim against the E&D Defendants is DISMISSED.

25

## E. Fraud

Similarly, Plaintiffs' claim for fraud against the E&D Defendants must be dismissed. Under North Carolina law, the elements of fraud include "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Forbis v. Neal*, 361 N.C. 519, 527, 649 S.E.2d 382, 287 (2007) (internal quotation marks omitted). "Additionally, any reliance on the allegedly false representations must be reasonable." *Id.* Plaintiffs have failed to assert any factual allegations which would establish the elements of fraud. Indeed, the sum of Plaintiffs' allegations as to fraud is the following: "The facts as pleaded above show that Defendants materially misrepresented relevant facts and law, intending for each Named Plaintiff to rely on the same, and each Named Plaintiff did reasonably rely on the same, and was actually damaged, entitling each Named Plaintiff to actual damages . . . ." Amend. Compl. [DE-23] ¶ 767. The "facts as pleaded above" that concern the E&D Defendants, however, show only actions taken in the course of state court litigation where certain E&D Defendants acted as opposing counsel. The court agrees with the E&D Defendants that, in the context of the previous state-court lawsuits, "[i]t is a mystery how Plaintiffs could have reasonably relied on representations by Defendants E&D and sustained injury as a result." E&D Mot. for J. on the Pleadings [DE-100] p. 19.

Plaintiffs, again, appear to concede as much, by (1) relying again on their conclusory allegations regarding conspiracy and (2) suggesting that N.C. Gen. Stat. § 84-13 saves their claim. With regard to conspiracy, Plaintiffs' conclusory allegations do not save their fraud claim against the E&D Defendants, for the reasons already discussed by this court. Nor does Plaintiffs' reference to N.C. Gen. Stat. § 84-13—for the first time in response to the motion for judgment on the

26

pleadings—help. That statute provides: "If any attorney commits any fraudulent practice, he shall be liable in an action to the party injured, and on the verdict passing against him, judgment shall be given for the plaintiff to recover double damages." *Id.* The North Carolina Court of Appeals has stated "that if a plaintiff fails to state a viable claim for fraud, constructive fraud, or any 'fraudulent practice,' no derivative claim for double damages arises under N.C. Gen. Stat. § 84-13." *Wilkins v. Safran*, 185 N.C. App. 668, 676, 649 S.E.2d 658, 664 (2007) (citing *Jordan v. Crew*, 125 N.C. App. 712, 720, 482 S.E.2d 735, 739 (1997)). For the reasons already stated by this court, Plaintiffs have failed to state a viable claim for fraud or conspiracy to commit any fraud or fraudulent practice, and therefore the derivative claim for damages under § 84-13 also fails.[10]

## F. Gross and Willful Legal Malpractice

Plaintiffs allege that "[t]he facts as pleaded above show that any Defendants who actually communicated with any Named Plaintiff acted as attorneys to that Named Plaintiff, and while doing so, knowingly breached their duties of competence and diligence, and dispensed grossly erroneous legal advice, intending each Named Plaintiff to follow same, proximately causing damage to each Named Plaintiff . . . ." Amend. Compl. [DE-23] ¶ 768. The E&D Defendants move for dismissal as to this claim, arguing that as acting for attorneys for parties adverse to Plaintiffs, they owed no duty of care to Plaintiffs. Again, Plaintiffs apparently concede this claim, stating "[t]his count does not apply to E&D in the first place, except, again by conspiracy." Pl.'s Mem. in Opp. to Mot. for J. [DE-107] p. 12. Accordingly, again, this court cannot find sufficient Plaintiffs' wholly conclusory

---

[10] To the extent the fraud claim is asserted against Defendants Emmanuel & Dunn, PLLC, Lee W. Bettis, Jr., Robert L. Emmanuel, Raymond E. Dunn, and Stephen A. Dunn, this too would appear to be barred by *res judicata. See Cullen*, 2012 WL 3573696, at \*8 (dismissing the state-court plaintiffs' claim for "statutory attorney fraud" against state-court defendants because it constituted a collateral attack on a dismissal order in a previous case).

27

allegations regarding the alleged conspiracy. Plaintiffs' claim for legal malpractice against the E&D Defendants is therefore dismissed.

## H. Unjust Enrichment

The court similarly concludes that Plaintiffs' claim for unjust enrichment against the E&D Defendants must be dismissed. "In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988). Thus, a plaintiff must allege that he or she conferred a benefit upon the defendant; the defendant consciously accepted the benefit, and the benefit was not gratuitous. *Id.*

Here, Plaintiffs have not alleged that they conferred a benefit upon the E&D Defendants. Rather, they allege that CCDN defrauded Plaintiffs of their property, and later paid the E&D Defendants attorney fees. Amend. Compl. [DE-23] ¶ 757. Plaintiffs offer no argument against E&D's assertion that they have failed to allege their conferral of a benefit on the E&D Defendants. With no allegation that Plaintiffs conferred a benefit on the E&D Defendants, the unjust enrichment claim must be dismissed.

## I. Conversion/Constructive Trust

Plaintiffs also allege that E&D Defendants "wrongfully deprived Plaintiffs of their property by means of mail and wire fraud and false pretenses, or by receiving it from other Defendants who so obtained it from Plaintiffs, and then willfully continued to deprive Plaintiffs of their property by means including but not limited to willfully keeping Plaintiff's property for their own use instead of giving it back to Plaintiffs," rendering all the Defendants liable for conversion. Amend. Compl. [DE-23] ¶ 758. Plaintiffs also assert that the court should impose a constructive trust. *Id.* ¶ 756. There are no factual allegations sufficient to support the idea that any of the E&D Defendants

28

participated in mail or wire fraud or the tort of false pretenses, or that they conspired to do so. Consequently, the court examines whether the remainder of Plaintiffs' allegation–namely, that E&D Defendants were paid by parties to defend them in civil actions and that said parties paid the E&D Defendants with money wrongfully obtained from Plaintiffs–is sufficient to state a claim for conversion under North Carolina law.

The North Carolina Supreme Court has stated that "[t]he tort of conversion is well defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to one another, to the alteration of their condition or the exclusion of an owner's rights." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quoting *Peed v. Burleson's Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956)) (alteration in original). Accordingly, there are "two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant." *Id.* (citing *Gadson v. Toney*, 69 N.C. App. 244, 246, 316 S.E.2d 320, 321-22 (1984)).

Although money may be the subject of an action for conversion, generally such a claim is actionable "*only* when it is capable of being identified and described." *Variety Wholesalers*, 365 N.C. 528, 723 S.E.2d at 529 (quoting *Alderman v. Inmar Enters., Inc.*, 201 F. Supp. 2d 532, 548 (M.D.N.C. 2002)). Recently the North Carolina Supreme Court, in *Variety Wholesalers*, observed that the old rules for a claim of conversion, which required identification of specific bills or coins, are unworkable in our current economic system. *See Variety Wholesalers*, 365 N.C. at 528-29, 723 S.E.2d at 750 (observing that "numerous courts around the country have adopted rules requiring the specific identification of a sum of money, rather than identification of particular bills or coins"). In that case, the plaintiff, Variety, contracted with a third-party, Salem, to pay and audit transportation

29

bills incurred by the plaintiff. 365 N.C. 520, 723 S.E.2d at 744. Under the contract, Salem received all of Variety's freight bills from carriers, audited the bills, and prepared master invoices for Variety, and Variety would then pay Salem who in turn paid the carriers. Salem instructed Variety to send the amounts owed to a Wachovia bank account, where payments from other clients were also sent. Salem, however, did not tell Variety that the bank account was in fact controlled by another entity, Ark, which had made loans to Salem and used the bank account to pay off the Salem loans. Eventually, when Variety's shippers complained about not getting paid, Variety terminated the contract and filed suit against Salem to recover approximately $888,0000 it had forwarded to the bank account but which Salem had not used to pay the carriers. Variety then discovered that Ark controlled the account and demanded that Ark return the funds. Ark refused, and Salem added it as a defendant alleging claims for conversion and constructive trust. At both the trial court level and during appeals, Ark argued "[i]n effect, . . . that the moment the funds were transferred into the Wachovia account and commingled with the deposits of Salem's other customers, they ceased to be identifiable and any conversion claim must fail." *Id.* at 528, 723 S.E.2d at 750.

The North Carolina Supreme Court rejected Ark's argument, and stated that "[i]n the context of this conversion claim, we conclude that funds transferred electronically may be sufficiently identified through evidence of the specific source, specific amount, and specific destination of the funds in question." *Id.* at 529, 723 S.E.2d at 750-51. The court specifically observed that "[o]ther courts confronting this challenge have held similarly" and in a footnote, cited cases from around the nation. *Id.* at 529, 723 S.E.2d at 751 n.4.[11] Importantly, the facts in *Variety*, and in each of the cases

---

[11] The footnote reads as follows:

*See, e.g., ADP Investor Commc'n Servs., Inc. v. In House Att'y Servs., Inc.,* 390 F. Supp. 2d 212, 224-25

Case 7:09-cv-00183-F   Document 117   Filed 09/30/13   Page 30 of 50

cited by the court in the footnote, involved allegations or evidence of a transfer of a specific amount

of money from a plaintiff to a defendant, with the defendant taking possession of that specific,

identifiable amount.

The court also rejected the argument that Variety's constructive trust claims failed because

Ark and Variety did not share a fiduciary relationship. The court explained:

> A constructive trust is a duty, or relationship, imposed by courts of equity to prevent
> the unjust enrichment of the holder of title to, or of an interest in, property which
> such holder acquired through fraud, breach of duty, or some other circumstance
> making it equitable for him to retain it against the claim of the beneficiary of the
> constructive trust.

*Id.* at 530, 723 S.E.2d at 752 (quoting *Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 211, 171

S.E.2d 873, 882 (1970)) (citations omitted). Although "a fiduciary relationship, while generally the

<hr />

(E.D.N.Y.2005) ("ADP alleges . . . that it seeks 'a specifically identifiable sum of money . . . sent by wire transfer from [ADP's] account with JP Morgan Chase in New York to In House's bank account at California Bank & Trust c/o ILCS.' ADP also states the exact amount of the wire transfer, $277,699.89. This Court finds then that ADP properly alleges an identifiable sum of money and therefore ADP's conversion claim does not fail as a matter of law." (second and third alterations in original)); *see also Creative Trade Group, Inc. v. Int'l Trade Alliance, Inc.,* No. 08 C 2561, 2009 WL 3713345, at *9 (N.D.Ill. Nov. 4, 2009) ("For the purposes of this motion, the court assumes the wire transfer fund, which is a specific and documented amount of money ($171,388) transferred to McGrath from an outside source (Creative's account), is sufficiently identifiable to support Creative's conversion claim."); *St. Paul Travelers Cas. & Sur. Co. of Am. v. Manley,* No. 05–cv–01195–REB–BNB, 2006 WL 3019673, at *1 n. 2 (D.Colo. Oct. 23, 2006) (unpublished order) ("It thus appears to be the consensus among courts that a claim of conversion is cognizable when it relates to a wire transfer of funds which are traceable to a specific bank account."); *Trey Inman & Assocs. v. Bank of Am.,* 306 Ga.App. 451, 458, 702 S.E.2d 711, 717 (2010) (holding that "$76,122.31 in funds that TIA disbursed to Brookchase Builders via wire transfer was specific and identifiable and therefore was a proper subject for the Bank's conversion claim"); *Mfrs. Hanover Trust Co. v. Chem. Bank,* 160 A.D.2d 113, 125, 559 N.Y.S.2d 704, 712 (1990) (holding funds identifiable where "[plaintiff] effected a wire transfer to [defendant] of a specific sum, $223,280.74, to be credited to a specific account"), *appeal denied by* 77 N.Y.2d 803, 568 N.Y.S.2d 15, 569 N.E.2d 874 (1991).

*Variety Wholesalers*, 365 N.C. at 529, 723 S.E.2d at 751 n.4.

Case 7:09-cv-00183-F   Document 117   Filed 09/30/13   Page 31 of 50

basis for constructive trust claims, [it] is not strictly required" to maintain a claim for a constructive trust. *Id.* Rather, in the absence of a fiduciary relationship, a plaintiff "faces the difficult task of proving 'some other circumstances making it inequitable'for [the defendant] to possess the [challenged] funds." *Id.* (quoting *Wilson*, 276 N.C. at 211, 171 S.E.2d at 882). The court explained that "if Ark had actual or constructive notice that Salem did not have ownership of the funds deposited in the Wachovia account, Ark's continued acceptance of those funds could be considered unconscientious or inequitable and could thus permit the imposition of a constructive trust." *Id.* The court further explained that "[t]he constructive trust issue involves a similar tracing and identification analysis as is presented in the conversion claim," and accordingly, commingling of funds would not prevent a constructive trust claim.

The parties did not have the benefit of the *Variety Wholesalers* decision when briefing the motion for judgment on the pleadings. Because this court believes the decision may be relevant to the plausibility of the Plaintiffs' claims, the parties are DIRECTED to submit briefing, within thirty days of the filing date of this order, on the impact, if any, of *Variety Wholesalers* on the Plaintiffs' claims for conversion and constructive trust.

## H. Negligence

Plaintiffs also complain of actions Defendant Bettis took in the course of representing CCDN in various state court actions, and assert that the other E&D Defendants are liable to Plaintiffs for failing to properly supervise Bettis. Amend. Compl. [DE-23] ¶ 765 ("The facts as pleaded above show that all E&D Defendants except Mr. Bettis negligently supervised him, despite all E&D Defendants' knowledge of his misbehavior, and thereby allowed him to violate the Revised Rules of Professional Conduct, . . . fraudulently misrepresent material issues of fact and law to tribunals

32

and opponents with the purpose and effect of depriving said tribunals of legitimacy and illegally and wrongfully delaying and denying relief to which Plaintiff were legally and unquestionably entitled . . . ; and despite actual knowledge of the foregoing, all other E&D Defendants retained Mr. Bettis in their service and allowed, requested, or ordered him to keep on acting that way . . . ."). Because Plaintiffs fail to allege a plausible negligent supervision claim, it must be dismissed.

In *Cullen*, the North Carolina Court of Appeals rejected the identical claim and argument advanced by the Plaintiffs here. Specifically, the court held that the firm of "Emmanuel & Dunn and its members owed no duty, for negligence purposes, to the parties who were adverse to the firm's clients." *Cullen*, 2012 WL 3573696, at *5. This court finds the *Cullen*'s court reasoning to be persuasive and an accurate assessment of North Carolina law. Accordingly, Plaintiffs' claim for negligent supervision is DISMISSED.

## I. Tortious Interference with Prospective Business Advantage

Similarly, the court must conclude that the Plaintiff's claim for tortious interference with prospective business advantage must be dismissed. The Plaintiffs allege:

The facts as pleaded above show that Plaintiffs had a reasonable expectation of recovering damages to which they were legally entitled to in [state court litigation and federal *Southwood* litigation] but Defendants prevented, reduced, or delayed Plaintiffs' recovery, not in legitimate exercise of any Defendant's own rights, but with design to injure Plaintiffs by means of sham litigation, willfully and maliciously misrepresenting facts and law to courts and opponents in order to win in the absence of reasonable expectation of a favorable ruling, and willfully and maliciously depriving Plaintiffs of Counsel's services, as evidenced by Mr. Bettis's demonstrated personal malice and hostility toward Plaintiffs and Counsel, when Defendants knew there was no good faith defense to Plaintiffs' claims, rendering Defendants liable for the entire amount of damages owed to Plaintiffs in [the state court litigation and federal *Southwood* litigation] together with punitive damages sufficient to punish and deter similar malicious and willful misconduct.

33

Amend. Compl. [DE-23] ¶ 764. As the North Carolina Court of Appeals succinctly explained, to the extent that the Plaintiffs allege that they should be able to sue the E&D Defendants for obtaining a dismissal of other cases brought by the Plaintiffs, the claim is meritless. *Cullen*, 2012 WL 3573696, at \*6 (observing that it would be insensible to suggest that plaintiffs should be able to sue opposing counsel for interfering with their ability to prevail in state court litigation by moving for, and obtaining, dismissal of the suit). The North Carolina Court of Appeals also found that to the extent such a claim is premised upon the E&D Defendants successfully moving for the disqualification of the Plaintiffs' Counsel in state court litigation, it too is meritless because it amounts to a collateral attack on a state court's order. *Id.* at \*7. This court finds this reasoning to be persuasive, and accordingly, adopts it herein and DISMISSES the claim for tortious interference with prospective economic advantage.

## J. Unfair and Deceptive Trade Practices Act

Plaintiffs concede that they cannot state a claim under the UDTPA against the E&D Defendants. *See* Pl.'s Mem. in Opp. to Mot. for J. [DE-107] pp. 15-16. Accordingly, this claim is DISMISSED.

## K. Civil Conspiracy

Under North Carolina law, a civil conspiracy[12] is defined as "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (2) resulting

---

[12] Numerous North Carolina courts have recognized that there is no separate action, per se, for civil conspiracy in North Carolina. *See, e.g., Dove v. Harvey,* 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005). Rather, proven allegations of civil conspiracy do "nothing more than associate the defendants together and perhaps liberalize the rules of evidence." *Id.* In short, "[t]he gravaman of the action is the resultant wrong, and not the conspiracy itself." *Muse v. Morrison,* 234 N.C. 195, 198, 66 S.e2d 783, 785 (1951).

34

in injury to plaintiff inflicted by one or more the conspirators; and (4) pursuant to a common scheme." *Strickland v. Hedrick*, 194 N.C. App. 1, 19, 669 S.E.2d 61, 72 (2008). "A threshold requirement in any cause of action for damages caused by acts committed pursuant to a conspiracy must be the showing that a conspiracy in fact existed." *Henderson v. LeBauer*, 101 N.C. App. 255, 261, 399 S.E2d 142, 145 (1991).

As this court already has noted, Plaintiffs have failed to make anything more than conclusory allegations as to any agreement between any of the E&D Defendants or anyone else. *See, e.g.* Amend. Compl. [DE-23] ¶ 522 ("E&D Defendants thus conspired among themselves and with their clients to do illegal acts and to do legal acts (defense of civil claims) in an illegal way (misrepresent facts and law, argue frivolous legal theories, personally attack and intimidate Plaintiffs and Counsel, and file motions and papers only for delay, all paid for with money that their clients criminally defrauded from Plaintiffs) . . . ."). In the absence of any factual allegations supporting the inference of an agreement between any of the E&D Defendants and anyone else to do an illegal act, or a legal act in an illegal way, the civil conspiracy charge must be DISMISSED.

## L. Piercing the Corporate Veil

Plaintiffs' claim for piercing the corporate veil, at least as it is alleged as to the individual E&D Defendants also fails. The equitable doctrine of piercing the corporate veil is recognized in North Carolina and has been implemented through "the instrumentality rule." *Glenn v. Wagner*, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985). Accordingly, where a corporate entity is "a mere instrumentality or alter ego of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State, the corporate entity will be disregarded." *Henderson v. Security Mortg. & Finance Co.*, 273 N.C. 253, 260, 160 S.E.2d 39, 44

35

(1968). "[T]o prevail under the instrumentality rule, a party must prove three elements: (1) stockholders' control of the corporation amounting to 'complete domination' with respect to the transaction at issue; (2) stockholder's use of this control to commit a wrong . . . ; and (3) this wrong or breach of duty must be the proximate cause of the injury to the other party." *State ex. rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 441, 666 S.E.2d 1097, 114 (2008). Here, there are no factual allegations suggesting that any of the individual E&D Defendants abused the corporate form. Accordingly, the claim for piercing the corporate veil is DISMISSED.

## M. Punitive Damages

Finally, the E&D Defendants ask the court to dismiss Plaintiffs' claim for punitive damages. North Carolina allows punitive damages only where a plaintiff proves, by clear and convincing evidence, one or more of aggravating factors, such as fraud, malice, or willful or wanton conduct. *See* N.C. Gen. Stat. § 1D-15(a). The E&D Defendants argue, *inter alia*, that Plaintiffs have failed to sufficiently allege that any of the E&D Defendants engaged in conduct such as fraud, malice, or willful or wanton conduct which would warrant an award of damages.

A punitive damages claim is not technically an independent cause of action, but is instead dependent upon an award of compensatory damages on one of a plaintiff's other claims. *See, e.g., Eli Research, Inc. v. United Commc'ns Grp., LLC*, 312 F.Supp. 2d 748, 764 (M.D.N.C. 2004) (explaining that under North Carolina law, "claims for punitive damages and injunctive relief do not exist as unique causes of action per se"); *see also* N.C. Gen. Stat. § 1D-15(a) ("Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages . . . ."). Accordingly, "[t]he question of whether or not a party can recover punitive damages goes to the issue of the relief the plaintiff may ultimately be due. It has no bearing on the validity of the

36

cause of action set out in the plaintiff's complaint." *Jones v. Wake County Hosp. Sys.*, 786 F.Supp. 538, 547 (E.D.N.C. 1991).

Consequently, because one claim–conversion–may still survive the motion to dismiss, it is premature to foreclose the possibility of punitive damages at this time. In this respect, the E&D Defendants' motion to dismiss is DENIED.

## IV. ARNOLD DEFENDANTS' MOTION TO DISMISS

The Arnold Defendants move to dismiss Plaintiffs' claims against them, arguing that (1) Plaintiffs lack standing to assert claims against the Arnold Defendants; (2) Plaintiffs have failed to state any claims against the Arnold Defendants, and (3) this court lacks personal jurisdiction over them. Because the Arnold Defendants' arguments regarding personal jurisdiction implicate the court's power to adjudicate Plaintiffs' claims, the court addresses those arguments first. *Sucampo Pharms., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 548 (4th Cir. 2006) (citing *Ruhrgas AG v. Marathon Oil*, 526 U.S. 574, 584 (1999)).

### A. Personal Jurisdiction

A federal court may dismiss an action pursuant to Federal Rule of Civil Procedure 12(b)(2) if the court lacks personal jurisdiction over nonresident defendants. "When a court's personal jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). If the existence of personal jurisdiction depends on disputed factual questions, the court may resolve the challenge of its jurisdiction by conducting an evidentiary hearing, or by deferring ruling pending the receipt of evidence related to the jurisdictional question at trial. *Id.* When, however,

37

the court decides a motion to dismiss for lack of jurisdiction solely on the basis of the motions, legal memoranda, and affidavits submitted to the court, the plaintiff bears the burden of making a *prima facie* showing of personal jurisdiction. *Id.* When considering a jurisdictional challenge, the court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id.* In this case, Plaintiffs must make a *prima facie* showing of personal jurisdiction over the Arnold Defendants.

It this case, Plaintiffs can attempt to establish personal jurisdiction over the Arnold Defendants in two ways: "(1) the nationwide service of process provisions of the RICO statute and then pendent personal jurisdiction over the state causes of action or (2) by a traditional minimum contacts and due process analysis for all causes of action." *Sadighi v. Daghighfeker*, 36 F. Supp. 2d 267, 271 (D.S.C. 1999); *see also* Fed. R. Civ. P. 4(k)(1)(A) and (C) (providing that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant ... who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located ... or when authorized by federal statute").

### 1. Traditional personal jurisdiction

With regard to the latter route, in order for a district court to exercise personal jurisdiction pursuant to a state long-arm statute, (1) the forum state's long-arm statute must authorize the exercise of personal jurisdiction and (2) the defendant must have sufficient minimum contacts with the forum state to satisfy the Due Process Clause of the Fourteenth Amendment. *See Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). Because North Carolina's long-arm statute "is designed to extend jurisdiction over nonresident

38

defendants to the fullest limits permitted by the Fourth Amendment's due process clause," these inquiries collapse into one. *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997).

In this manner, personal jurisdiction can either be specific or general. First, if the foreign party maintains "continuous and systematic" contacts with a state, the state has general personal jurisdiction over the party, and the nonresident may be sued in that state on any claim. *See Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 446 (1952). When no such general contacts exist, a court may assert personal jurisdiction only if the litigation arises out of the defendant's contacts with the form state. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 n.8 (1984).

Plaintiffs do not appear to contest that the Amended Complaint lacks allegations showing that either of the Arnold Defendants have had such contacts with North Carolina that this court could exercise either specific or general personal jurisdiction over them. Rather, the Plaintiffs argue the Arnold Defendants have conspired with other Defendants, especially CCDN, "to help [CCDN] stay in business and to receive Plaintiffs' money from them." Under this conspiracy theory of jurisdiction, the Arnold Defendants are imputed with constitutionally sufficient contacts with North Carolina through the actions of their alleged co-conspirators. To succeed under this theory, however, Plaintiffs would have to allege a plausible claim that (1) a conspiracy existed; (2) the Arnold Defendants participated in the conspiracy; and (3) a co-conspirator's activities in North Carolina in furtherance of the conspiracy constituted constitutionally minimal contacts. *See Lolavar v. de Santibanes*, 430 F.3d 221, 239-30 (4th Cir. 2005). Mere allegations of a conspiracy will not suffice. *See id.* at 229.

Plaintiffs have failed to allege sufficient facts that a civil conspiracy involving the Arnold Defendants existed. Plaintiffs have summarily alleged that the Arnold Defendants are "conspirator[s]

with all other Defendants,"Amend. Compl. [DE-23] ¶¶ 53-54, and that Andy Arnold has damaged Plaintiffs "by conspiring with his clients to conduct sham litigation without any reasonable expectation of a favorable ruling in [the South Carolina case], including but not limited to advancing frivolous arguments to dismiss for failure to state a claim and lack of jurisdiction." *Id.* ¶ 58. This amounts to nothing more than allegations of "'parallel conduct and a bare assertion of conspiracy.'" *A Society Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556). In the absence of factual allegations showing a conspiracy involving either of the Arnold Defendants, the Plaintiffs' conspiracy-based theory of jurisdiction fails.

## 2. RICO service of process

Plaintiffs also argue that this court may assert personal jurisdiction over the Arnold Defendants pursuant to RICO's service of process provisions. It is well-settled that one means of authorizing service to effect personal jurisdiction is pursuant to federal statute. Section 1965(d) of RICO provides that "[a]ll other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." The Fourth Circuit Court of Appeals has construed this section as "authoriz[ing] nationwide service of process and, thus, the exercise of personal jurisdiction in any district court." *D'Addario v. Geller*, 264 F. Supp. 2d 367, 386 (E.D.Va. 2003) (citing *ESAB Group, Inc. v. Centricut*, 126 F.3d 617, 626 (4th Cir. 1997)).[13] Accordingly, in the Fourth Circuit, service of

---

[13] In this respect, the Fourth Circuit has diverged from other circuit courts of appeals. The federal courts of appeals agree that RICO provides for nationwide service of process; however, there is a split as to which subsection of RICO provides for such service. *See* DAVID B. SMITH & TERRANCE G. REED, CIVIL RICO ¶ 6.02 at 6-39 (2013) (observing that the Fourth and Eleventh Circuit hold that § 1965(d) authorize nationwide service of process, while the Second, Seventh, and Ninth Circuits hold that § 1965(b) authorize nationwide service of process). Section 1964(b) provides:

In any action under section 1964 of this chapter in any district court of the United States

40

process on a RICO defendant where that defendant resides is sufficient to establish personal jurisdiction, provided the assertion of jurisdiction comports with due process. *ESAB Group*, 126 F.3d at 626 ("[W]here, as here, Congress has authorized nationwide service of process . . . so long as the assertion of jurisdiction over the defendant is compatible with due process, the service of process is sufficient to establish the jurisdiction of the federal court over the court person of the defendant.").

With regard to the due process inquiry, "[u]nlike the assertion of jurisdiction under the state long-arm statute, where due process concerns are addressed under the Fourteenth Amendment's due process clause, assertion of jurisdiction under a federal statute pursuant to Federal Rule of Civil Procedure 4(k)(1)(C) requires application of the due process clause of the Fifth Amendment." *Noble Sec.*, 611 F. Supp. 2d at 552 (citing *ESAB Group*, 126 F.3d at 626-27). "Therefore, when a federal court asserts personal jurisdiction over a defendant in a suit based on a statute that includes a provision for nationwide service of process, the relevant inquiry is not whether the defendant has sufficient minimum contacts with the forum state, but rather, whether the defendant has sufficient

---

in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965(b). The courts that rely on § 1965(b) as the basis of nationwide service of process have determined that "a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant," and then personal jurisdiction may be exercised over additional nonresident defendants if the "ends of justice so require." *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 71-72 (2d Cir. 1998). In contrast, by relying on § 1965(d) for nationwide service of process, "and thus bypassing the restrictive language of subsection (b), the Fourth Circuit has permitted RICO plaintiffs to sue all Defendants in one forum without any need for a showing that the 'ends of justice' required such an assertion of personal jurisdiction over nonresident defendants." *Sadighi*, 36 F. Supp. 2d at 274. Therefore, in this case, there is no need to perform an "ends of justice" inquiry. *See D'Addario*, 264 F. Supp. 2d at 387 n.22 ("[T]he Fourth Circuit seems to have eradicated the 'ends of justice' inquiry by using section 1964(d) to acquire personal jurisdiction.").

41

contacts with the United States as a whole." *Schrader v. Trucking Employees of North Jersey Welfare Fund, Inc.*, 232 F. Supp. 2d 560, 571 (M.D.N.C. 2002). Additionally, the Fifth Amendment's due process clause also "protects the liberty interests of individuals against unfair burden and inconvenience." *ESAB Group*, 126 F.3d at 626. However, according to the Fourth Circuit, " 'it is only in highly unusual cases that inconvenience will arise to a level of constitutional concern.' " *Id.* at 627 (quoting *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 947 (11th Cir. 1997)). The Arnold Defendants do not contest that they were served with process, presumably in South Carolina, a judicial district where they reside. *See* 18 U.S.C. § 1965(d). The record contains no evidence showing "such extreme inconvenience or unfairness as would outweigh the congressionally articulated policy of allowing the assertion of *in personam* jurisdiction" in North Carolina. *Id.* Consequently, this court may constitutionally exercise personal jurisdiction over the Arnold Defendants to adjudicate the RICO claims.

The question remains, however, whether the court has personal jurisdiction to adjudicate the remaining claims against the Arnold Defendants. The Fourth Circuit, like most other circuit courts of appeals, has recognized the doctrine of "pendent personal jurisdiction," whereby a district "a district court which has obtained personal jurisdiction over a defendant by reason of a federal claim [has the power] to adjudicate state claims . . . so long as the facts of the federal and state claims arise from a common nucleus of operative fact" and as "long as the federal claim is not wholly immaterial or insubstantial." *ESAB Group*, 126 F.3d at 628-29. Moreover, other courts have recognized, under the doctrine of pendant personal jurisdiction, a court's power to adjudicate other federal claims, so long as the additional federal claim arises out of the same common nucleus of operative facts. *United States v. Botefuhr*, 309 F.3d at 1273 (10th Cir. 2002); *Noble Sec. Inc. v. MIZ Eng'ing, Ltd.*,

42

611 F. Supp. 2d 513, 555-56 (E.D.Va. 2009) (examining the *ESAB Group* opinion and concluding that "the Fourth Circuit has approved the exercise of pendant personal jurisdiction over claims arising from a common nucleus of operative fact, whether the additional claim is a state claim or federal claim"). If, however, the court dismisses federal claim providing personal jurisdiction – also known as the "anchor" federal claim–early in the litigation, the court may, in its discretion, dismiss the remaining federal and state claims. *See United States v. Botefuhr*, 309 F.3d 1263, 1274 (2002) (holding that a district court abused its discretion by retaining jurisdiction over remaining claims after it dismissed, early in the litigation, the "anchor" federal claim); *Glenwood Farms, Inc. v. O'Connor*, 666 F.Supp.2d 154, 166 &173 (D.Me. 2009) (concluding that if the anchor claim is dismissed for failure to state a claim, the remaining claims also must be dismissed); *D'Addario v. Geller*, 264 F. Supp. 2d 367, 387-88 (E.D. Va. 2003) ("[I]f the court were later to determine that the federal claim(s) should be dismissed against a defendant, the state claims against that defendant would also have to be dismissed, unless another basis for asserting personal jurisdiction exists.").

Here, Plaintiffs have failed to state a claim as to the "anchor" RICO claims. As Plaintiffs did with the E&D Defendants, they allege the Arnold Defendants violated 18 U.S.C. §§ 1962(c) and 1962(d) by representing CCDN in litigation and accepting payment for the legal services rendered. Amend. Compl. [DE-23] ¶¶ 53-58 (alleging, *inter alia*, that by defending CCDN in litigation over trademark infringement and tortious interference with contract, Andy Arnold "knows of the illegal and fraudulent nature of CCDN, and that all fees he receives from it are the product of mail, wire, and bank fraud on Plaintiffs, and that defending CCDN only perpetuates the pattern of racketeering activity"). And again, as was the case with the RICO claims against the E&D Defendants, Plaintiffs' § 1962(c) claim against the Arnold Defendants premised on the alleged CCDN enterprise fails

43

because Plaintiffs have failed to set forth factual allegations showing the Arnold Defendants participated or conducted in the CCDN enterprise. Rather, the Arnold Defendants' defense of CCDN in the trademark infringement and tortious interference with contract litigation, without other involvement in the alleged debt elimination and credit restoration scheme, quintessentially is the "traditional rendition of legal services." *Handeen*, 112 F.3d at 1349; *see also Thomas*, 9 F. Supp. 2d at 554 (D.Md. 1998) ("Since *Reves*, a number of Courts have dismissed complaints and granted summary judgment in favor of professionals, such as lawyers and accountants, whose professional services were essential to an enterprise yet did not participate in the direction, operation, or management of the enterprise."). Again, the acceptance of money in exchange for the performance of these traditional legal services also fails to strike at the heart of the CCDN's alleged debt and credit restoration scheme. *Thomas*, 9 F. Supp. 2d at 554 (recognizing that § 1962(c) liability could lie where the services provided by an outside professional "strike at the very core of the enterprise and therefore [the outside professional] providing the services is managing or operating the firm").

Nor do Plaintiffs' allegations in support of their § 1962(c) claim premised on the alleged WAA enterprise fare any better. Plaintiffs allege that Andy Arnold "directs, controls, and participates in WAA through a pattern of racketeering activity, to wit, has used WAA to violate 18 U.S.C. §§ 1341, 1343, 1344, 1956 and/or 1957 on three or more occasions since October 2008 and will do so for at least the duration . . . . of the [South Carolina] case, making WAA a RICO enterprise." Amend. Compl. [DE-23] ¶ 59. There are no factual allegations, however, which support Plaintiffs' conclusory and speculative assertion that Andy Arnold used WAA to commit fraud, mail or wire fraud, or bank fraud, in violation of 18 U.S.C. §§ 1341, 1343, 1344. Moreover, for the reasons discussed above with regard to the E&D Defendants, Plaintiffs' allegations regarding money

44

laundering–premised on Andy Arnold's acceptance of legal fees from CCDN–fail to satisfy the requirement that they were injured in their property or business. *See* 18 U.S.C. § 1964(c). The Amended Complaint suggests that Andy Arnold's legal work in the South Carolina action has delayed or hindered the Plaintiff's realization of their expected or anticipated recovery of damages against CCDN. Again, as with Plaintiffs' § 1962(c) claim against the E&D Defendants, the possibility of a judgment in Plaintiffs' favor, and the possibility of a right to recover therefrom, is not a cognizable injury under RICO, but is instead a "mere expectancy." *Regions Bank*, 387 F.3d at 730; *Price*, 138 F.3d 607. With no allegation of an injury to property or business cognizable under RICO, Plaintiffs' lack standing to pursue this claim against the Andy Arnold with regard to his acts in the alleged WAA enterprise.

Additionally, Plaintiffs' allegations are also insufficient to establish a § 1962(d) conspiracy claim against the Arnold Defendants. Plaintiffs have summarily alleged that the Arnold Defendants are "conspirator[s] with all other Defendants," *see* Amend. Compl. [DE-23] ¶¶ 53-54, and that Andy Arnold has damaged Plaintiffs "by conspiring with his clients to conduct sham litigation without any reasonable expectation of a favorable ruling in [the South Carolina case], including but not limited to advancing frivolous arguments to dismiss for failure to state a claim and lack of jurisdiction." *Id.* ¶ 58. As this court has previously discussed with regard to the conspiracy claims against the E&D Defendants,and with regard to the "conspiracy theory" of personal jurisdiction over the Arnold Defendants, this does not satisfy *Twombly*'s requirement for a plaintiff to plead enough factual matter "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." 550 U.S. at 556. Instead, there is only Plaintiffs' factually unsupported assertion that by agreeing to defend CCDN in a civil action, the Arnold Defendants necessarily agreed with the CCDN

45

Defendants to perpetuate a pattern of racketeering activity. With no other factual allegations suggesting that the Arnold Defendants entered into a conspiracy prohibited by § 1962(c), Plaintiffs have failed to state a plausible claim against the Arnold Defendants. The RICO claims against the Arnold Defendants are therefore DISMISSED.

Because Plaintiffs have failed to state a claim under RICO against the Arnold Defendants, the court declines to exercise pendant personal jurisdiction over the remaining claims against these Defendants, and they too are DISMISSED.

## V. MANGER MOTION TO DISMISS

Defendant Philip Manger moves to dismiss Plaintiffs' claims against him, arguing that this action must be dismissed (1) for lack of personal jurisdiction; (2) lack of subject matter jurisdiction, and (3) failure to state a claim.

As to the latter two arguments, Manger "adopts and incorporates those positions of the Arnold motion to dismiss with respect to lack of subject matter jurisdiction and the Plaintiff's [sic] failure to state a claim." Manger Mem. Mot. to Dismiss [DE-92] unnumbered p. 5. With regard to any failure to state a claim, Manger cannot adopt and incorporate the Arnold Defendants' arguments and expect any success. A motion to dismiss for failure to state a claim requires the court to engage in an analysis as to the facts as alleged against a particular defendant; accordingly, the Arnold Defendants' arguments as to why Plaintiffs failed to allege sufficient facts to state a plausible claim *against the Arnold Defendants* does very little to explain why Plaintiffs failed to state a claim against Manger. The court will not, on its own accord and in the absence of any specific argument from Manger, attempt to parse through the Amended Complaint and determine whether Plaintiffs have stated various claims against Manger. Similarly, the Arnold Defendants' argument regarding subject

46

matter jurisdiction were centered on the fact-specific inquiry as to whether Plaintiffs sufficiently alleged that the Arnold Defendants engaged in conduct which caused injury to Plaintiffs. Even though Manger presents no argument specific to the claims asserted against him, the court can confidently state that a cursory review of the Amended Complaint shows that Plaintiffs have adequately alleged injury caused by the conduct of Manger.

As to the one issue actually briefed by Manger, lack of personal jurisdiction, the court finds his arguments to be unavailing. Specifically, as the court discussed with regard to the Arnold Defendants, in the Fourth Circuit service of process on a RICO defendant where that defendant resides is sufficient to establish personal jurisdiction, provided the assertion of jurisdiction comports with due process. *ESAB Group*, 126 F.3d at 626. Moreover, the doctrine of pendent personal jurisdiction allows the court to assert personal jurisdiction over the defendant as to those claims that arise out of a common nucleus of operative fact with the anchor federal claim.

The record here shows that Manger was served with process in Connecticut, the judicial district where he resides. *See* Manger Aff. [DE-92] ¶ 2 ("I was served in this matter on April 13, 2010, by a Connecticut marshal at my residence, 19 Tauton Hill Road, Newtown, Connecticut."). Moreover, there is no suggestion in the record that a forum in North Carolina will be so extremely inconvenient or so unfair to the Manger as to outweigh the congressionally articulated policy of permitting the exercise of personal jurisdiction pursuant to RICO's nationwide service of process provisions. Nor can the court say that Plaintiffs' RICO claim against Manger is not colorable.

Consequently, the court has personal jurisdiction over Manger, pursuant to the RICO statute, and pendent jurisdiction over the remaining claims against him. Manger's Motion to Dismiss [DE-91] is therefore DENIED.

47

## VI. MOTION TO APPOINT RECEIVER

Plaintiffs also have filed a Motion for Appointment of Receivers [DE-94] for Defendants Aegis Corp., Debt Jurisprudence, Inc., David Kramer, Marcia Murphy, CCDN LLC, Legal Debt Cure LLC, and Philip M. Manger.

At the outset, the court must address what law governs the appointment of receivers in this action, asserting both federal claims and state-law claims. The majority of federal courts to have considered the issue have concluded that federal law governs a district court's decision on whether to appoint a receiver. *See Nat'l P'ship Inv. Corp. v. Nat'l Housing Development Corp.*, 153 F.3d 1289, 1291-92 (11th Cir. 1998) (concluding that federal law governs the appointment of a receiver in a diversity case); *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993); *see also* Fed. R. Civ. P. 66 ("These rules govern an action in which the appointment of a receiver is sought . . . ."); 12 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE, § 2983 (2d ed. 1997) (explaining that "*Hanna v. Plumer* makes it clear that the doctrine of *Erie Railroad Company v. Tompkins*, which requires application of state law on matters of substance, does not apply to the appointment of a receiver by a federal court").

"[T]he appointment of a receiver is not a matter of right, but one resting in the sound discretion of the court." *Hutchinson v. Fidelity Inv. Ass'n*, 106 F.2d 431, 436 (4th Cir. 1939); WRIGHT & MILLER, *supra* § 2983. "Because receivership interferes very seriously with the defendant's property rights, a party seeking the appointment of a receiver must generally show that he has some 'legally recognized right' in the property, such as a security interest, that amounts to more than a mere claim against the defendant." *Manuel v. Gembala*, No. 7:10-CV-4-FL, 2010 WL

3860407, at *6 (E.D.N.C. Sept. 20, 2010) (quoting *Piambino v. Bailey*, 757 F.2d 1112, 1131-32 (11th Cir. 1985)).

Here, Plaintiffs can show they have potential claims against the various Defendants, but they cannot show that they have a legally recognized property right to the property. *See Manuel*, 2010 WL 3860407, at *6 ("Even if plaintiffs' claim is meritorious, plaintiffs still have not demonstrated a 'legally recognized right' in defendants' property, such as a security interest, which would favor the appointment of a receiver."). Under these circumstances, the court, in its discretion, declines to appoint a receiver for any of the Defendants, the motion [DE-94] is DENIED.[14]

## VII. ADDITIONAL MATTERS

Many of the claims asserted by Plaintiffs in this action appear to be duplicative, or overlap, with claims asserted by Plaintiff Southwood in Civil Action No. 7:09-CV-81. Accordingly, the parties are DIRECTED to show cause, within 30 days, why the instant action should not be consolidated with Civil Action No. 7:09-CV-81 pursuant to Rule 42(a) of the Federal Rules of Civil Procedure. The court reserves ruling on the Plaintiffs' Motion to Certify Class [DE-96] pending the decision on whether these actions should be consolidated.

## VIII. CONCLUSION

For the foregoing reasons, it is ORDERED that:

(1) the E&D Defendants' Motion to Dismiss [DE-45] is DENIED;

(2) the Arnold Defendants' Motion to Dismiss [DE-52] is ALLOWED;

---

[14] Defendant Philip Manger's Motion to Stay [DE-104] the consideration of the motion to appoint receiver is DENIED as moot.

(3) Defendant Manger's Motion to Dismiss [DE-91] is DENIED;

(4) Plaintiffs' Motion to Appoint Receiver [DE-94] is DENIED;

(5) the E&D Defendants' Motion for Judgment on the Pleadings [DE-98] is ALLOWED in part and all claims except Counts I and III are DISMISSED;

(6) Plaintiffs and the E&D Defendants are DIRECTED to submit briefing, within thirty days of the filing date of this order, on the impact, if any, of *Variety Wholesalers* on the Plaintiffs' claims for conversion and constructive trust;

(7) Defendant Manger's Motion to Stay the Motion to Appoint Receiver [DE-104] is DENIED;

(7) the E&D Defendants' Motion to Expedite [DE-110] is DENIED, and

(8) the remaining parties are DIRECTED to show cause, within 30 days, why the instant action should not be consolidated with Civil Action No. 7:09-CV-81 pursuant to Rule 42(a) of the Federal Rules of Civil Procedure.

SO ORDERED.

This the 30 day of September, 2013.

James C. Fox
James C. Fox
Senior United States District Judge

50